1  CHRISTOPHER BURKE (214799)
   WALTER W. NOSS
2  MARY K. BLASY (211262)
   KRISTEN M. ANDERSON (246108)
3  PENELOPE D. ABDIEL (271162)
   SCOTT+SCOTT LLP
4  707 Broadway, Suite 1000
   San Diego, CA 92101
5  Tel:  619-233-4565
   Fax:  619-233-0508
6  cburke@scott-scott.com
   wnoss@scott-scott.com
7  mblasy@scott-scott.com
   kanderson@scott-scott.com
8  pabdiel@scott-scott.com

9

   Attorneys for Plaintiff
10
                      UNITED STATES DISTRICT COURT
11
                      NORTHERN DISTRICT OF CALIFORNIA
12
   PIPE FITTERS LOCAL UNION NO. 120          )
13 PENSION FUND, On Behalf of Itself and All  )
   Others Similarly Situated,                )
14                                           )   COMPLAINT FOR VIOLATIONS OF THE
                           Plaintiff,        )   FEDERAL ANTITRUST LAWS AND THE
15                                           )   CARTWRIGHT ACT OF THE
                        vs.                  )   CALIFORNIA BUSINESS & PROFESSIONS
16                                           )   CODE §16700, ET SEQ.
   BARCLAYS CAPITAL INC., THE                )
17 GOLDMAN SACHS GROUP, INC.,                )
   KOHLBERG KRAVIS ROBERTS &CO. L.P.,        )
18 VESTAR CAPITAL PARTNERS INC.,             )   CLASS ACTION
   CENTERVIEW PARTNERS LLC, and              )
19 PETER J. MOSES,                           )
                                             )   JURY TRIAL DEMANDED
20                         Defendants.       )
                                             )
21

22

23

24

25

26

27

28

FILED

MAR – 7 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
E-filing

EDL

CV 11 1064

1    Plaintiff, Pipe Fitters Local Union No. 120 Pension Fund, on behalf of itself and all others
2    similarly situated, alleges the following for its complaint.

3                    **INTRODUCTION AND SUMMARY OF THE ACTION**

4    1.    This is an antitrust class action brought to and prevent threatened injuries and to recover
5    for injuries to Plaintiff and the members of the Class as a result of Defendants' bid-rigging scheme in
6    violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and the Cartwright Act, California Business
7    & Professions Code §16700, *et seq.* Plaintiff's and the Class' injuries and threatened injuries are of
8    the type that the antitrust laws are intended to prevent and the conduct challenged herein is not
9    regulated by federal securities law.[1] This action seeks damages, injunctive relief, cost of suit, and
10   reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26
11   and California Business & Professions Code §16700, *et seq.*

12   2.    Bid-rigging occurs when competitors agree in advance to limit competition among
13   potential bidders in a competitive bidding process. Bid-rigging takes many forms, including bid
14   suppression where one or more competitors who otherwise would be expected to bid, or who have
15   previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the
16   designated winning competitor's bid will be accepted. Bid-rigging has long been considered a *per se*
17   violation of the federal antitrust laws, because of its well-known anti-competitive effects.

18   3.    Here, Defendants Kohlberg Kravis Roberts & Co. L.P. ("KKR"), Vestar Capital
19   Partners Inc. ("Vestar") and Centerview Partners LLC ("Centerview") (collectively, "Private Equity
20   Defendants") engaged in bid-rigging to suppress the price at which they would purchase Del Monte
21   through a leveraged buyout that was announced on November 25, 2010 (the "Del Monte LBO"). As
22   part of their unlawful bid-rigging scheme, KKR secretly combined with Vestar, who had previously
23   submitted the highest competing bid. Further, the Private Equity Defendants conspired with Peter J.
24   Moses and his employer Barclays Capital Inc. ("Barclays"), the investment bankers retained by the

25   
26   [1] *Dahl v. Bain Capital Partners, LLC*, Memorandum and Order, No. 1:07-cv-12388, ECF No. 157 (D. Mass. Dec. 15, 2008) at 6-8. Collusion among certain of the largest private equity firms in connection with bidding on billion dollar-plus LBOs is also the subject of an ongoing investigation by the Antitrust Division of the U.S. Department of Justice.
27   
28   

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                                    1

1 | Del Monte Board of Directors, to accomplish the bid suppression scheme by, among other things,
2 | giving Barclays one third of the buy-side financing in exchange for Barclays using its control over
3 | the bidding and go-shop processes to suppress competition. The Private Equity Defendants also
4 | conspired with The Goldman Sachs Group, Inc. ("Goldman Sachs"), giving them a "piece of the
5 | action" to prevent a would-be competitor from upsetting the bid suppression scheme.

6 | 4. Ultimately, the Private Equity Defendants arranged to purchase Del Monte at the
7 | unlawfully suppressed price of $19 per share. The price of $19 per share was lower than the price
8 | would have been in the absence of Defendants' collusion, including the agreement of other private
9 | equity firms, who had shown interest in the LBO not to compete with the Private Equity Defendants.
10 | Indeed, absent the collusive conduct of the Defendants, the price determined through a truly
11 | competitive bidding process would have been at least $21 per share, and perhaps as high as $26 per
12 | share.

13 | 5. As such, on behalf of itself and the Class of Del Monte shareholders as defined in
14 | paragraph 21, below, Plaintiff brings this action pursuant to §1 of the Sherman Act, 15 U.S.C. §1,
15 | Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, and the Cartwright Act of California
16 | Business & Professions Code §16700, *et seq.*

17 | ### JURISDICTION AND VENUE

18 | 6. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and
19 | 26, for damages and to secure injunctive relief against Defendants for violations of §1 of the
20 | Sherman Act, 15 U.S.C. §1, as alleged herein.

21 | 7. Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by Sections
22 | 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. The Court has jurisdiction over the state law
23 | claims under 28 U.S.C. §1367, because those claims are so related to the federal claim that they form
24 | part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy
25 | for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different
26 | state than the Defendants.

27 | 8. Venue is proper in this District pursuant to §§12 and 16 of the Clayton Act, 15 U.S.C.
28 | §§22 and 26, and 28 U.S.C. §1391(b)-(d). Del Monte is headquartered in this District, one or more

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS 2

1   of the Defendants resided, transacted business, was found, or had agents in this District, and a
2   substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of
3   the affected interstate trade and commerce described herein has been carried out, in this District.
4   This Court has personal jurisdiction over each Defendant because each was engaged in an illegal
5   scheme directed at and with the intended effect of causing injury to persons and entities residing in,
6   located in, or doing business throughout the United States.

7       9.    Intradistrict assignment to the San Francisco and Oakland Division is appropriate
8   because a substantial part of the events or omissions which gave rise to the claims occurred in San
9   Francisco County.

10   **PARTIES**

11   **Plaintiff**

12       10.  Plaintiff Pipe Fitters Local Union No. 120 Pension Fund ("Plaintiff") is located in
13   Cleveland, Ohio and is a public retirement trust fund organized under the laws of the State of Ohio.
14   Plaintiff is a shareholder of Del Monte. Plaintiff and the other members of the Class are threatened
15   with or have suffered injury to their business or property by reason of the antitrust violations alleged
16   herein.

17   **Defendants**

18       11.  Defendant Barclays is the investment banking division of Barclays Bank PLC. It is
19   headquartered in the United States at 745 Seventh Avenue, New York, New York, and maintains
20   offices in San Francisco and Menlo Park, California, among other locations. Barclays provides
21   financial advice to companies and financial sponsors, including "sell-side" advice to LBO targets
22   and "buy-side" advice to private equity firms looking to acquire the targets. Barclays also provides
23   debt financing to, among others, financial buyers in mergers and leveraged buy-outs.

24       12.  Defendant Peter J. Moses is a managing director with Barclays Capital with coverage
25   responsibility for Del Monte. Mr. Moses resides in Connecticut. Upon information and belief,
26   Mr. Moses has regular business contacts with persons in this District, and periodically travels to this
27   District for business.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS    3

1    13.  Defendant Goldman Sachs is, *inter alia*, an investment bank that provides financial
2  advice to companies and financial sponsors and provides financing, including the debt financing for
3  a large percentage of LBOs. Goldman Sachs also operates a private equity arm that invests in, *inter*
4  *alia*, public to private transactions. Goldman Sachs is headquartered at 200 West Street, New York,
5  New York, and maintains offices in San Francisco and Menlo Park, California, among other
6  locations.

7    14.  Defendant KKR is a private equity firm headquartered at 9 West 57th Street, New York,
8  New York and maintains offices in San Francisco and Menlo Park, California, among other
9  locations.

10    15.  Defendant Vestar is a private equity firm headquartered at 245 Park Avenue, 41st Floor,
11  New York, New York.

12    16.  Defendant Centerview, is a private equity firm headquartered at 31 West 52nd Street,
13  22nd Floor, New York, New York, and maintains offices in San Francisco, California, among other
14  locations.

15    17.  The defendants listed in ¶¶11-16 above are collectively referred to, where
16  appropriate, as "Defendants" and includes, in addition to those named specifically above, all of the
17  named entity Defendants' predecessors, and each of their affiliates that in any way participated in the
18  acts and transactions described herein.

19    18.  To the extent that subsidiaries and divisions within Defendants' corporate families
20  any way participated in the acts and transactions described herein they played a material role in the
21  conspiracy alleged, they were active, knowing participants and their conduct was known to and
22  approved by their respective corporate parents named as Defendants in this complaint.

23    19.  Whenever reference is made to any act of any entity such as a corporation or limited
24  liability company, the allegation means that the entity engaged in the acts or transactions by or
25  through its officers, directors, agents, employees or representatives while they were actively engaged
26  in the management, direction, control or transaction of the corporation's business or affairs such that
27  the entity, including each named Defendant, is legally responsible for their conduct.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    4

1 | **CO-CONSPIRATORS**

2      20. Various other persons, firms and corporations, not named as Defendants, have

3 participated as co-conspirators with Defendants and have performed acts and made statements in

4 furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their

5 co-conspirators whether named or not named as Defendants in this complaint.

6      21. Each of the Defendants named herein acted as the agent or joint-venturer of or for the

7 other Defendants with respect to the acts, transactions, violations and common course of conduct

8 alleged herein.

9 | **CLASS ACTION ALLEGATIONS**

10      22. Plaintiff bring this action on behalf of itself and as a class action under the provisions of

11 Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

12 following class (the "Class"):

13      All persons and entities who owned the common stock of Del Monte after the
announcement of the Del Monte LBO. Excluded from the Class are the federal

14      government, the Court and any members of the Court's immediate family, the
Defendants, and their co-conspirators, and the present and former directors, officers,

15      partners and affiliates of the foregoing.

16      23. The Class is so numerous and geographically dispersed that joinder of all members is

17 impracticable. Plaintiff believes that while there are thousands of Class members as described

18 above, their exact number and identities are ascertainable from trading records.

19      24. There are questions of law and fact common to the Class, which relate to the existence

20 of the conspiracy alleged and the type and common pattern of injury threatened as a result thereof,

21 including, but not limited to:

22          a.   whether Defendants and their co-conspirators engaged in the anti-competitive
schemes alleged herein;

23          b.   the identity of the participants in the conspiracy;

24          c.   the duration of the conspiracy alleged in this Complaint;

25          d.   whether the alleged conspiracy violated §1 of the Sherman Act;

26          e.   whether the alleged conspiracy violated §16700 of the California Business

27            and Professions Code;

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS    5

f.  whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint threatens to cause injury to Plaintiff and other members of the Class;

g.  the effect of Defendants' conspiracy on the price being offered by Defendants and their co-conspirators for Del Monte to its shareholders; and

h.  the appropriate injunctive relief.

25. Plaintiff's claims are typical of the claims of the other Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class. As a shareholder of Del Monte, Plaintiff's interests coincide with and not antagonistic to those of the other members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

26. Defendants and their co-conspirators have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate injunctive relief with respect to the Class as a whole.

27. Questions of law or fact common to class members predominate over any questions affecting only individual members. These include the common questions identified in paragraph 23 *above*. Moreover a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, because, for example, numerous class members will have suffered damages that will make the prosecution of individual suits under the antitrust laws economically unlikely.

## TRADE AND COMMERCE

28. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce. During the time period covered by this Complaint, Defendants and their co-conspirators used the instrumentalities of interstate commerce to carry out their conspiracy.

## FACTUAL ALLEGATIONS

### A.    Overview and Background

29. Private equity firms, such as Defendants KKR, Vestar, and Centerview, operate outside the purview of the legal and administrative regime that regulates some aspects of the financial

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                6

1 | securities markets. Federal securities laws do not regulate these funds. One of the features that
2 | enables private equity firms to raise large amounts of capital is that they are not regulated, and thus
3 | can avoid scrutiny. Further, one of the goals of an LBO is to remove the target company from the
4 | regulatory regime that governs public companies. This lack of regulation and the ability of private
5 | equity firms to operate with minimum transparency facilitated the formation of the conspiracy
6 | alleged herein.

7 | 30. There is mounting evidence that "bidding teams" of otherwise competing private equity
8 | firms lead to bids, and ultimate share prices in LBOs that are lower than those prices would be in the
9 | absence of such "bidding teams."[2] Defendants Barclays, Goldman Sachs and KKR have previously
10 | been identified as engaging in collusive bidding on other LBOs.

11 | 31. Private equity firms often acquire companies through leveraged buyouts. An LBO
12 | occurs when a purchaser acquires a controlling majority of the shares of the "target company," then
13 | withdraws the shares of the company from public stock exchanges, thereby taking the company
14 | private. Private equity firms finance their acquisitions of target public companies through a
15 | combination of equity and borrowed funds. The debt portion of the funding, which is generally
16 | several multiples greater than the equity portion, is collateralized using the target company's own
17 | assets, hence the name *leveraged* buyout.

18 | 32. Private equity firms generally organize limited partnerships of investors. The limited
19 | partnerships are controlled by the management of the particular private equity firm that serves as a
20 | general partner. The funds invested in LBOs or other private equity transactions are identified by
21 | their private equity managers during the lifetimes of the funds.

22 | 33. Federal securities laws do not regulate these funds. One of the features that enables
23 | private equity firms to raise large amounts of capital is that they are not regulated, and thus can avoid
24 | scrutiny. Further, one of the goals of an LBO is to remove the target company from the regulatory
25 | regime that governs public companies.

26 |

27 | ² *See* Micah S. Officer, Oguzhan Ozbrs, Berk A. Sensoy, *Club Deals in Leveraged Buyouts*, JOURNAL OF FINANCIAL ECONOMICS, Vol. 98, Issue 2 (Nov. 2010).

28 |

1

**B. The Del Monte LBO**

2 34. Del Monte is one of the country's largest producers, distributors and marketers of
3 premium quality branded pet products and food products for the U.S. retail market, generating
4 $3.7 billion in net sales in fiscal 2010. Del Monte's pet food and pet snacks brands include *Meow*
5 *Mix*, *Kibbles 'n Bits*, *Milk-Bone*, *9Lives*, *Pup-Peroni*, *Gravy Train*, *Nature's Recipe*, *Canine Carry-*
6 *Outs*, and other brand names, and its leading food brands include *Del Monte*, *Contadina*, *S&W*,
7 *College Inn*, and other brand names. Del Monte also produces and distributes private label pet
8 products and food products. Del Monte's products are sold nationwide, as well as to the U.S.
9 military, certain export markets, the food service industry, and other food processors.

10 35. Barclays has a strong presence in the consumer food and pet product sectors where Del
11 Monte operates. Peter J. Moses ("Moses") is the Barclays managing director with coverage
12 responsibility for Del Monte. Barclays is one of Del Monte's principal investment banks.

13 36. Barclays also has a strong relationship with private equity firms that participate in
14 LBOs, including KKR. In fact, KKR is one of Barclays more important clients. Over the past two
15 years, KKR has paid Barclays over $66 million in fees.

16

**C. Barclays Secretly Promoted the Del Monte LBO**

17 37. In the Fall and Winter of 2009, without Del Monte's knowledge, Barclays secretly
18 initiated talks with private equity firms in which it suggested the idea of acquiring Del Monte in a
19 going-private transaction. For example, on December 17, 2009, Moses and other Barclay bankers
20 met with KKR. Moses had similar communications with other private equity firms, including
21 Apollo Management.

22 38. In early January 2010, Moses and Barclay met with KKR again. At this meeting, KKR
23 said it was ready to take the next step with Del Monte and planned to partner with Centerview on a
24 bid.

25 39. In the January 2010 meeting, Moses discussed the process with KKR; a narrow private
26 solicitation of interest to a small group of private equity firms and no strategic buyers, such as
27 another food company. Barclays stood to benefit from this scheme by providing both advice to Del

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    8

1 Monte and financing to the private equity buyer – financing that a strategic buyer would not
2 typically need.

3     40. In January 2010, prompted by its discussions with Barclays, Apollo submitted a written
4 indication of interest in acquiring Del Monte at a purchase price of $14 to $15 per share.

5     41. Upon receiving Apollo's letter, Del Monte contacted Barclays. Barclays thereafter
6 convinced Del Monte to retain it as the Company's exclusive sell-side financial advisor. This role
7 gave Barclays control over the bidding process. Barclays did not tell Del Monte that it previously
8 had secret meetings with private equity firms for the purpose of putting Del Monte in play.

9     42. In keeping with the bid-suppression scheme it had previously hatched with KKR and
10 Centerview, Barclays thereafter encouraged Del Monte's unsuspecting Board to focus on a very
11 small group of private equity firms, to the exclusion of strategic parties, even though Barclays itself
12 recognized that strategic buyers generally were in a position to pay more.

13     43. Barclays then contacted certain private equity firms, including KKR, Apollo, The
14 Carlyle Group, CVC Capital Partners, and Blackstone. As alleged above, Barclays had already had
15 prior secret contacts with some of these private equity firms.

16     44. Thereafter, Defendant Vestar and a strategic buyer, Campbell's Soup, each separately
17 contacted Barclays and requested that they be included in the process.

18     45. In February 2010, in exchange for being granted access to Del Monte's confidential
19 information, KKR, Apollo, The Carlyle Group, CVC Capital Partners, Vestar and Campbell's Soup
20 each executed confidentiality agreements with Del Monte and began due diligence into the
21 Company.

22     46. The confidentiality agreements were intended to preserve the integrity of the
23 competitive bidding process. Specifically, these agreements precluded each of the interested parties,
24 without the express written consent of Del Monte's Board, from speaking with anyone – including
25 any of the other potential bidders – about either the subject confidential information or about the
26 very fact that they were in discussions with the Company or had submitted any bids for Del Monte.
27 In addition, the confidentiality agreements prohibited the bidders from entering into any "agreement,
28 arrangement or understanding, or any discussions which might lead to such agreement, arrangement

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS     9

1  or understanding, with any other person . . . including other potential bidders and equity or debt

2  financing sources, regarding a possible transaction involving the Company." That is, the agreement

3  prohibited new bidding teams by parties with access to the confidential information. The agreements

4  stated, in pertinent part, as follows:

5  [Y]ou agree that, without the prior written consent of the Company, you and your
   Representatives will not disclose to any other person (other than your

6  Representative) the fact that you are considering a possible transaction with the
   Company, that this Agreement exists, that the Confidential Information has been

7  made available to you, that discussions or negotiations are taking place concerning a
   possible transaction involving the Company or any of the terms, conditions or other

8  facts respect thereto (including the status thereof) (collectively "Transaction
   Information") . . . . Without limiting the generality of the foregoing, you further

9  agree that you will not, directly or indirectly, share the Confidential Information with
   or enter into any agreement, arrangement or understanding, or any discussions which

10  would reasonably be expected to lead to such an agreement, arrangement or
   understanding with any persons, including other potential bidders and equity or debt

11  financing sources (other than your Representatives as permitted above), regarding a
   possible transaction involving the company without the prior written consent of the

12  Company and only upon such person executing a confidentiality agreement in favor
   of the Company with terms and conditions consistent with this Agreement.

13
   47. These "No-Teaming" provisions of the confidentiality agreements were intended to

14
   promote fair and competitive bidding by, among other things, preventing bidders from teaming

15
   together to rig bidding.

16
   48. The confidentiality agreements also facilitated Barclays' ability to control and

17
   manipulate the bidding process to its benefit because signatories were prohibited from discussing

18
   financing except with Barclays.

19
   49. On March 11, 2010, Del Monte received indications of interest from each of: Carlyle,

20
   Apollo, CVC, KKR and Vestar. Vestar's was the highest, at $17.00 to $17.50 per share. KKR,

21
   acting with Centerview as its acknowledged partner, indicated it would bid $17 per share, an offer

22
   worth almost $100 million less than Vestar's.

23
   50. Vestar, which had special expertise in the food business and strength as an operator said

24
   "[i]t would expect to commit to half of the required equity in this transaction and would look to

25
   partner with another private equity firm to fill out the remaining portion." Possible partners for

26
   Vestar suggested by Moses and Barclays included Carlyle, Apollo, and CVC. However, "[i]nternal

27
   KKR documents reflect concern about Vestar working with another firm." In other words, KKR was

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    10

1    concerned about a rival bidder with the strength and credibility to compete against it in any

2    continued bidding for the Company, particularly in light of the fact that Vestar had already submitted

3    a bid that exceeded the KKR/Centerview bid.

4    **D.     KKR, Centerview, Vestar, and Moses/Barclays Conspire to Breach the No-Teaming Provision of the Confidentiality Agreements**

5

6        51.   On March 18, 2010, Del Monte's Board determined that the Company's stand-alone

7    growth prospects were sufficiently strong such that it would not be in the shareholders' best interests

8    to proceed with discussions regarding a going-private transaction at the price levels reflected in the

9    bids it had received. Accordingly, the Board instructed Barclays "to shut [the] process down and let

10   buyers know the company is not for sale."

11       52.   The next day, Barclays' Moses reported to his colleagues that "I remain optimistic that

12   over the next 2-4 quarters this [Del Monte] gets sold." For the next several months, Moses

13   continued to secretly meet with private equity firms to promote the sale of Del Monte although it had

14   no authorization to do so. By September, Barclays noted internally that it expected that the Del

15   Monte Board's decision to cease sales negotiations "may be revisited in the coming months."

16       53.   In the late summer of 2010, the price of Del Monte stock began to fall. Barclays

17   immediately recognized the opportunity to get the sales process restarted.

18       54.   In or about August – September 2010, Barclays, through Moses, communicated with

19   KKR and Vestar about having them combine to acquire Del Monte. For KKR/Centerview and

20   Vestar to communicate about Del Monte – let alone exchange price information and submit a bid –

21   without Del Monte's express written authority of constituted a clear breach of the "No-Teaming"

22   provisions of the confidentiality agreements.

23       55.   Nevertheless, by September 14, 2010, at Barclays' urging, and without Del Monte's

24   prior written consent, KKR/Centerview and Vestar agreed to work together. Barclays, KKR,

25   Centerview, and Vestar hid their combination from Del Monte.

26       56.   On October 11, 2010, KKR submitted an offer to acquire Del Monte for $17.50 per

27   share – the highest price previously indicated by Vestar. KKR's bid was presented solely on behalf

28   of itself and Centerview, even though Vestar was already secretly part of the combination.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    11

1      57. Del Monte's Board met to consider the KKR/Centerview offer on October 13, 2010 and
2   again on October 25, 2010. At the October 25, 2010 meeting, the Board decided to negotiate
3   exclusively with the KKR/Centerview venture exclusively, which unbeknownst to it, included
4   Vestar.

5      58. On October 27, 2010, Del Monte rejected the $17.50 offer but permitted
6   KKR/Centerview to conduct additional due diligence and to meet with Del Monte management. At
7   Barclays' urging, the Board did not contact any other potential buyers, including those who had
8   previously expressed an interest.

9      59. On November 4, 2010, Del Monte's senior management and Barclays met with
10   KKR/Centerview. Once again, Barclays, KKR, Centerview, and Vestar all agreed to conceal
11   Vestar's involvement from the Company at that meeting. KKR and Centerview, however, met with
12   Vestar the following day, November 5, and disclosed all that had occurred.

13      60. On November 8, 2010, *The London Evening Standard* published an article indicating
14   that KKR/Centerview was pursuing an acquisition of Del Monte at $18.50 per share.

15      61. Shortly thereafter, KKR and Centerview – continuing to secretly team with Vestar–
16   raised their bid to $18.50, having internally secured authority for a $19 bid.

17      62. At that time, and while continuing to conceal Vestar's involvement in the
18   KKR/Centerview group and without seeking approval from the Del Monte Board to do so, Barclays
19   started to line up its financing team to provide buy-side financing to the KKR-lead group on an as
20   yet unmade $19 bid.

21   **E.      The KKR/Centerview/Vestar Team Eliminates Any Potential Competitive Bids
                and Barclays Plays Both Sides of the Deal**

22
23      63. During the week of November 8, 2010, while the Del Monte Board was considering the
24   $18.50 offer, KKR/Centerview finally asked the Company's permission to allow Vestar to join their
25   group. However, they continued to hide that they had in fact already combined with Vestar – who
26   was the high bidder in March – and thus removed the threat that it would be a potential rival in any
27   new bid. Without this knowledge, the Board gave its permission.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    12

64. Next, on November 9, Barclays and KKR agreed to the payoff to Barclays for using its control of the bidding process to suppress the bidding in favor of the Private Equity Defendants by agreeing to give Barclays one-third of the buy-side financing. This was consistent with Defendants' scheme going back to January 2010. Again, Del Monte was not informed that Barclays and KKR had been discussing this scheme for months.

65. Barclays' participation in the buy-side financing was not necessary for the KKR-led Private Equity Defendants to close the deal, nor did it increase or would it increase the Private Equity Defendants' willingness or ability to increase their bid, nor would it enhance the timing of the transaction.

**F. The Scheme Works and a Deal Is Struck at a Collusive Price of $19 per Share**

66. On November 24, 2010, Del Monte, on Barclays' recommendation, approved the $19 offer and the Del Monte Board and the Private Equity Defendants signed a Merger Agreement relating to the Del Monte LBO.

67. After giving approval for Barclays to provide buy-side financing to the Defendants, the Del Monte Board retained Perella Weinberg Partners LP ("Perella") to provide an additional fairness opinion on the $19 per share bid. In rendering its opinion, Perella was not aware of the Defendants' efforts to suppress competition and to rig the bidding.

**G. The Defendants Rig the "Go-Shop" Period**

68. The Merger Agreement permitted a 45 day "Go-Shop" period, allowing Del Monte to seek superior offers. Goldman Sachs approached Del Monte about conducting the go-shop. Barclays expressed concern to KKR that Goldman Sachs intended to try to "scare up competition" during the go-shop. In response, KKR's Simon Brown said he would "manage it" directly with Goldman Sachs.

69. KKR thereafter offered Goldman Sachs' 5% participation in the syndication rights on the debt, Goldman Sachs dropped its efforts to conduct the Go-Shop, and Barclays was appointed to manage the Go-Shop period.

70. On January 8, 2011, the Go-Shop period expired and no superior offers were made.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    13

**H.     The Price of the Del Monte LBO Is the Product of Defendants' Bid-Suppression Scheme**

71.     The $19 per share price offered by the Private Equity Defendants is the product of Defendants' bid-suppression scheme and significantly undervalues the Company. The Company's own projections support a value well in excess of the offer price. In addition, each of the Private Equity Defendants have identified cost savings opportunities that could significantly increase earnings. Moreover, the Defendants' presentations project EBITDA pricing multiples that are substantially greater than the fairness opinions by Barclays and Perella.

72.     Del Monte's 2010 Annual Report to Shareholders stated, "In fiscal 2010 [ended May 2, 2010], Del Monte reported outstanding financial results, including solid top-line growth, strong cash flow, and record earnings . . . . Successful execution of our strategy made Del Monte Foods a much stronger company. Our fiscal 2010 accomplishments have established a new performance level and have set a higher base for growth and performance as we head into fiscal 2011." In fiscal 2010, the Company generated $250 million of cash flow, substantially reduced its debt levels, and increased its quarterly dividend by 80%.

73.     In announcing its financial results on June 10, 2010, the Company noted its confidence in its future performance, and that the Company had authorized a $350 million buyback:

> Del Monte delivered record fiscal 2010 results, establishing a higher level of earnings and setting the new base for sustained growth and performance in fiscal 2011 and beyond[.] . . . These exceptional results, including EPS growth of over 60% and operating margins expanding by over 350 basis points, were achieved while significantly increasing our marketing investment by over 50%. These results are a testament to the changes we have made and the actions we have taken over the past several years, as well as the successful execution of our growth strategy. Our confidence in our future is reflected by the fact that we are announcing today a $350 million, 3-year share repurchase authorization and an 80% increase in our dividend . . . . As we exit the fourth quarter fiscal 2010, and enter fiscal 2011, we feel very good about the health of our business and our long range guidance as we build future performance from this new higher base. For fiscal 2011, we will continue to invest behind our brands and key growth engines, while executing additional productivity initiatives. We are confident in our ability to drive long-term sustainable EPS growth.

74.     Del Monte's strength as a company is derived in large part from its pet food business. Pet food business sales have more than doubled in the past four years, bolstered by the purchase of

1  labels like *Meow Mix* and *Milk-Bone* dog treats. The pet food unit's share of Del Monte's total sales

2  has grown to 47% in the 12 months ended April 2010, from 29% in fiscal 2005. This unit's revenue

3  accounted for almost half of Del Monte's $3.74 billion in total revenue.

4      75.     The potential for the Company's growth as the economy recovers is outstanding.

5  More than 60% of U.S. households have at least one pet, according to the American Pet Products

6  Association. The U.S. pet food market grew 26% to $18.9 billion from 2005 to 2010, according to

7  data tracker Euromonitor International. With a powerful portfolio of brands, Del Monte products are

8  found in eight out of ten U.S. households.

9      76.     In light of Del Monte's recent impressive financial results and expectations for

10 growth, many financial analysts value its stock in excess of the $19 per share offer. For example:

11        •  Following the Company's June 10, 2010 announcement of its fiscal 2010 financial

12            results, a Deutsche Bank analyst noted Del Monte's positive and dramatic 2010

13            results, and opined that Del Monte's stock should trade in the "low $20s";

14        •  Stephens Inc. analyst Farha Aslam was recently quoted on *Bloomberg* saying that

15            Del Monte "has a strong cash flow and has taken down its debt levels, so it is well

16            positioned as a takeout candidate .... We believe the value of the pet foods business

17            was not being reflected in the stock." In addition, an analyst report by Stephens

18            stated that based on a sum-of-the-parts-analysis using comparable transactions, Del

19            Monte shares merit a $21-$22 take out price;

20        •  On October 27, 2010, a Wells Fargo analyst commented positively on Del Monte's

21            "free cash flow yield, the highest among our packaged food coverage" and the

22            Company's "strong cash flow, an increasing proportion of which is likely to be

23            returned to shareholders over the next several years.";

24        •  On November 19, 2010 Deutsche Bank reported that the two Del Monte segments

25            should sell at between 9x (consumer portion) and 11x (pet portion) EBITDA. The

26            report stated that rumored $18.50 price for Del Monte shares was only 7.4 x 2011

27            EBITDA which was low based on both "fundamental and M&A-related valuation.";

28            and,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS                    15

1           •   On November 19, 2010, D.A. Davidson & Co. reiterated its $22 price target.

2      77.     The direct effect of Defendants' bid-suppression scheme is that the $19 per share

3 price rigged by the Defendants is well below the price that would have resulted from a competitive

4 bidding process for Del Monte.

5                            **FIRST CLAIM FOR RELIEF**

6                          **Bid-Rigging - Sherman Act §1**

7      78.     Plaintiff alleges and incorporates by reference the allegations set forth above.

8      79.     Beginning at a time presently unknown to Plaintiff, but at least as early as 2009, and

9 continuing through the present, Defendants and their co-conspirators entered into a continuing

10 agreement, combination and conspiracy in restraint of trade to artificially depress the price offered

11 for Del Monte stock in connection with the Del Monte LBO, in violation of Section 1 of the

12 Sherman Act, 15 U.S.C. §1.

13      80.     The contract, combination or conspiracy has resulted in an agreement, understanding

14 or concerted action between and among the Defendants and their co-conspirators in furtherance of

15 which the Defendants and their co-conspirators restrained competition, and rigged the bids and

16 bidding process for Del Monte's common stock to be purchased in connection with the Del Monte

17 LBO. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust

18 laws and is, in any event, an unreasonable restraint of trade under the rule of reason, including

19 "quick look" and, is therefore unlawful.

20      81.     The Defendants' contract, combination, agreement, understanding or concerted action

21 with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful

22 conduct was through mutual understandings, combinations or agreements by, between and among

23 the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted

24 willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged

25 herein.

26      82.     The contract, combination or conspiracy has had the following effects, among others:

27

28

1        a.     Per share prices to be paid to Plaintiffs and Class members for Del Monte

2   common stock in connection with the Del Monte LBO were fixed or suppressed at an

3   artificially derived, uncompetitive level;

4        b.     Plaintiffs and Class members have been deprived of the benefits of free, open

5   and unrestricted competition for the Del Monte LBO;

6        c.     Competition to establish the price to be paid for acquiring Del Monte in the

7   LBO has been unlawfully restrained, suppressed and eliminated.

8       83.    As a direct and proximate result Plaintiff and members of the Class will be paid

9   hundreds of millions of dollars less for common stock tendered in the Del Monte acquisition to the

10  Private Equity Defendants and their co-conspirators than they would have been paid in a competitive

11  marketplace unfettered by the Defendants' and their co-conspirators' collusive and unlawful bid-

12  rigging conspiracy. This constitutes threatened loss or injury cognizable in equity for purposes of

13  Section 16 of the Clayton Act.

14      84.    Defendants' unlawful actions have also caused a price ceiling of $19 per share for Del

15  Monte's common stock. This price ceiling is artificially low and is a direct result of Defendants'

16  violations of the antitrust laws. As a direct and proximate result of these actions, all members of the

17  Class who owned Del Monte common stock after the announcement of the Del Monte LBO,

18  including those who sold their shares post-announcement, have been injured in an amount to be

19  determined at trial.

20                        **SECOND CLAIM FOR RELIEF**

21     **Bid-Rigging - Violations of California Business & Professions Code §16700, *et seq*.**

22      85.    Plaintiff alleges and incorporates by reference the allegations set forth above.

23      86.    Beginning at a time presently unknown to Plaintiff, but at least as early as 2009, and

24  continuing through the present, Defendants and their co-conspirators entered into a continuing

25  agreement, combination and conspiracy in restraint of trade to rig bidding and suppress bids in order

26  to artificially depress the price offered for Del Monte stock in connection with the Del Monte LBO,

27  in violation of California Business & Professions Code §16720.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS       17

1  87.  The aforesaid violations of California Business & Professions Code §16720
2  consisted, without limitation, of a continuing combination, trust, agreement, understanding, and
3  concert of action among the defendants, and others, concerning the purchase of Del Monte and its
4  common shares by means of the Del Monte LBO at artificially suppressed prices.

5  88.  For the purpose of forming and effectuating the aforesaid unlawful trust, the
6  Defendants and others have done those things to which they agreed, combined, and conspired to do
7  as described herein.

8  89.  By reason of the alleged violations of the antitrust laws, Plaintiff and other members
9  of the Class will be paid less for their Del Monte common stock than they would have been paid in
10  the absence of the illegal trust, choices of acquirers have been limited and, as a result, have been
11  injured in their business and property and they face the prospect of irreparable injury and unless
12  the Del Monte LBO is enjoined, will have suffered damages in an amount according to proof at trial.

13  **PRAYER FOR RELIEF**

14  WHEREFORE, Plaintiff, on behalf of itself and the Class prays for judgment as follows:

15  A.  Determining that this action is a proper class action, certifying Plaintiff as a class
16  representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this
17  Complaint as the operable complaint for class purposes;

18  B.  That the contract, combination, or conspiracy, and the acts done in furtherance thereof
19  by Defendants and their co-conspirators, as set forth in each claim for relief be adjudged to have
20  been in violation of §1 of the Sherman Act, 15 U.S.C. §1;

21  C.  That the contract, combination, or conspiracy, and the acts done in furtherance thereof
22  by Defendants and their co-conspirators, as set forth in the second claim for relief be adjudged to
23  have been in violation of the Cartwright Act, Cal. Bus. & Prof. Code §16720, *et seq.*

24  D.  That, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, Defendants and their
25  co-conspirators, including their directors, officers, employees, agents, along with their affiliates and
26  all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained
27  from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy
28  alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS  18

1 || purpose or effect, and from adopting or following any practice, plan, program, or device having a

2 || similar purpose or effect;

3      E.      That if the transaction is not enjoined that Plaintiff and the Class be awarded damages

4 || required by §4 of the Clayton Act, 15 U.S.C. §15, as well as pre-judgment and post-judgment

5 || interest at the highest legal rate from and after the date of service of this Complaint to the extent

6 || provided by law;

7      F.      That Plaintiff and the Class be awarded the cost of the suit, including reasonable

8 || attorneys' fees; and

9      G.      That Plaintiff and members of the Class have such other, further, and different relief

10 || as the case may require and the Court may deem just and proper under the circumstances.

11 **JURY DEMAND**

12      Plaintiff demands a jury trial for all issues so triable.

13 || DATED: March 7, 2011                      SCOTT+SCOTT LLP
                                     CHRISTOPHER M. BURKE

14                                        WALTER W. NOSS
                                       MARY K. BLASY

15                                        KRISTEN M. ANDERSON
                                     PENELOPE D. ABDIEL

16                                        *Christopher M. Burke /kmα*

17                                        CHRISTOPHER M. BURKE
                                       707 Broadway, Suite 1000

18                                        San Diego, CA 92101
                                       Tel: 619-233-4565

19                                        Fax: 619-233-0508
                                       Email:      cburke@scott-scott.com

20                                                     wnoss@scott-scott.com
                                                    mblasy@scott-scott.com

21                                                     kanderson@scott-scott.com
                                                    pabdiel@scott-scott.com

22

                                   and

23

                                   DAVID R. SCOTT

24                                    156 South Main Street
                                   P.O. Box 192

25                                    Colchester, CT 06415
                                   Tel: 860-537-3818

26                                    Fax: 860-537-4432
                                   Email:      drscott@scott-scott.com

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS      19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
K. CRAIG WILDFANG
THOMAS J. UNDLIN
STACEY P. SLAUGHTER
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Tel: 612-349-8500
Fax: 612-339-4181
Email:      kcwildfang@rkmc.com
             tjundlin@rkmc.com
             spslaughter@rkmc.com

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN (95624)
MATTHEW T. SINNOTT (229468)
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: 619-687-6611
Fax: 619-687-6610
Email:      dmogin@moginlaw.com
             msinnott@moginlaw.com

Attorneys for Plaintiff