**United States District Court**
For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6        FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   PIPE FITTERS LOCAL UNION NO. 120              No. C 11-01064 CW
    PENSION FUND, on behalf of itself
9   and all others similarly                     ORDER GRANTING
    situated,                                     DEFENDANTS' MOTION
10                                                TO DISMISS AND
              Plaintiff,                          GOLDMAN SACHS'
11                                                MOTION TO DISMISS
        v.                                        (Docket Nos. 66
12                                                and 67)
    BARCLAYS CAPITAL INC.; THE
13  GOLDMAN SACHS GROUP, INC.;
    KOHLBERG KRAVIS ROBERTS & CO.,
14  LP; VESTAR CAPITAL PARTNERS INC.;
    CENTERVIEW PARTNERS LLC; and
15  PETER J. MOSES,

16            Defendants.

17  _____/

18

19       Plaintiff Pipe Fitters Local Union No. 120 Pension Fund

20  charges Defendants Barclays Capital Inc.; The Goldman Sachs Group,

21  Inc.; Kohlberg Kravis Roberts & Co., L.P. (KKR); Vestar Capital

22  Partners Inc.; Centerview Partners LLC; and Peter J. Moses with

23  violating section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants

24  have filed a joint motion to dismiss.  Goldman Sachs has filed a

25  separate motion to dismiss.  The motions were heard on August 25,

26  2011.  Having considered oral argument and the papers submitted by

27  the parties, the Court GRANTS Defendants' joint motion and Goldman

28  Sachs' motion.

**United States District Court**
For the Northern District of California

BACKGROUND

The following allegations are taken from Plaintiff's first amended complaint (1AC).

Plaintiff, a public retirement trust fund, was a shareholder in Del Monte Foods.  Defendants were involved in the leveraged buyout (LBO) of Del Monte, which was structured as a merger.

In the latter half of 2009, Barclays, one of Del Monte's investment banks, suggested to several private equity firms the idea of acquiring the company.  Moses, a Barclays managing director, approached several firms, including KKR and Apollo Management.  Del Monte was not aware of, nor did it prompt, Barclays' and Moses' overtures.

In early January 2010, Moses again met with KKR.  He explained that bidding for Del Monte would occur through "a narrow private solicitation of interest to a small group of private equity firms and no strategic buyers, such as another food company."  1AC ¶ 41.  Barclays would benefit at both ends of this arrangement, by advising Del Monte on the sell-side and providing financing to a private equity firm on the buy-side.  KKR indicated that it was interested in bidding for Del Monte and would partner with Centerview to do so.

That same month, Apollo independently informed Del Monte that it was interested in purchasing the company for $14 to $15 per share.  In response to Apollo's offer, Del Monte retained Barclays as its sell-side adviser.  In this role, Barclays recommended that Del Monte consider only a select group of private equity firms.  Del Monte adopted this recommendation.  Barclays did not disclose

**United States District Court**
For the Northern District of California

1  to Del Monte that it previously had recommended the company to

2  private equity firms as an acquisition target.

3       Thereafter, Barclays invited KKR, Apollo, The Carlyle Group,

4  The Blackstone Group and CVC Capital Partners to participate in

5  the bidding process.  Subsequently, Vestar and Campbell's Soup, a

6  strategic buyer, asked Barclays to be included in the process.

7       In February 2010, the entities that expressed interest in Del

8  Monte entered into a confidentiality agreement with the company,

9  which contained a "No-Teaming" provision that "prohibited the

10 bidders from entering into any 'agreement, arrangement or

11 understanding, or any discussions which might lead to such

12 agreement, arrangement or understanding, with any other

13 person . . . including other potential bidders and equity or debt

14 financing sources, regarding a possible transaction involving the

15 Company.'"  1AC ¶ 48.

16      On March 11, 2010, Del Monte received written indications of

17 interest from KKR, Apollo, Carlyle, CVC and Vestar.  Vestar

18 submitted the highest bid, pledging to buy the company for $17.00

19 to $17.50 per share.  Vestar, however, disclosed that it would

20 need to partner with another private equity firm in order to

21 fulfill its bid.  KKR, along with its disclosed partner

22 Centerview, tendered the second-highest bid, at $17 per share.

23      On March 18, 2010, Del Monte rejected the bids.  Del Monte

24 instructed Barclays to "'shut [the] process down and let buyers

25 know the company is not for sale.'"  1AC ¶ 53.

26      Despite Del Monte's directive, Barclays continued to pursue

27 the sale of the company.  Sometime between August and September

28 2010, Moses suggested to KKR and Vestar that they "combine to

**United States District Court**
For the Northern District of California

1  acquire Del Monte."  1AC ¶ 56.  This suggestion and arrangement

2  violated the No-Teaming Provision of the February 2010

3  confidentiality agreement.  Nonetheless, KKR and its partner

4  Centerview agreed to join Vestar to attempt to purchase Del Monte.

5  On October 11, 2010, KKR and Centerview offered to acquire

6  Del Monte for $17.50 per share.  KKR, Centerview, Vestar and

7  Barclays concealed Vestar's involvement in the bid.  On October

8  25, 2010, Del Monte decided to negotiate solely with KKR and

9  Centerview, without knowledge that Vestar was part of the venture.

10 On October 27, 2010, Del Monte rejected the offer.  "At Barclays'

11 urging," Del Monte did not solicit additional offers.  1AC ¶ 60.

12 On November 8, 2010, a newspaper reported that KKR and

13 Centerview intended to acquire Del Monte for $18.50 per share.

14 Thereafter, KKR and Centerview tendered an increased bid of $18.50

15 per share.  However, they had authority to raise the bid to $19

16 per share.

17 While Del Monte was considering the $18.50-per-share bid, KKR

18 and Centerview finally sought permission from the company for

19 Vestar to be a part of the bidding team.  However, KKR and

20 Centerview did not disclose to Del Monte that Vestar actually had

21 been involved in the bidding process since September 2010.  Del

22 Monte granted KKR and Centerview's request.

23 On November 9, 2010, KKR agreed to obtain one-third of the

24 financing for the proposed Del Monte LBO from Barclays.

25 On November 24, 2010, relying on Barclays' recommendation,

26 Del Monte accepted the KKR-led team's $19-per-share offer and

27 approved of the team's decision to seek financing from Barclays.

28

Del Monte retained Perella Weinberg Partners LP to evaluate the fairness of the transaction.

The Del Monte Merger Agreement, signed by the company and the KKR-led team, required a forty-five-day "go-shop" period, during which Del Monte could solicit additional offers.  Goldman Sachs offered to administer the go-shop period on behalf of Del Monte. Barclays expressed to KKR its concern that Goldman Sachs was intending to "'scare up competition.'"  1AC ¶ 70.  Thereafter, KKR offered Goldman Sachs five-percent participation in the syndication rights on the LBO financing.  Goldman Sachs then discontinued its efforts to handle the go-shop period, which Barclays ultimately conducted.

On January 10, 2011, the go-shop period expired; no "pro-competitive superior offers" were made.  1AC ¶ 72.  On February 14, 2011, a Delaware Chancery Court enjoined the shareholder vote on the LBO to permit an additional twenty-day go-shop period, during which additional offers on Del Monte could be made.  Again, no offers were made.  The absence of offers was consistent with so-called "club rules" agreed to by members of a cartel of the largest private equity firms, which included KKR, Apollo, Carlyle and Blackstone.  Goldman Sachs knew of these rules.  These firms, among others, "agreed not to compete among themselves for" LBO transactions.  1AC ¶ 5.

On or about March 8, 2011, the Del Monte LBO merger took effect, and Del Monte shareholders were paid $19 per share.  In 2010, various financial analysts believed stock in the company to be worth more than this amount.

Plaintiff brings a claim under section 1 of the Sherman Act against all Defendants.  Plaintiff contends that Defendants engaged in "a horizontal bid-rigging scheme."  Pl.'s Corr. Mem. of P & A at 10:3.  It intends to prosecute this case as a class action.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal

United States District Court
For the Northern District of California

"without contradicting any of the allegations of [the] original complaint." <u>Reddy v. Litton Indus., Inc.</u>, 912 F.2d 291, 296 (9th Cir. 1990).

DISCUSSION

To state a claim under section 1 of the Sherman Act, a plaintiff "must demonstrate: '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'" <u>Tanaka v. Univ. of S. Cal.</u>, 252 F.3d 1059, 1062 (9th Cir. 2001) (quoting <u>Hairston v. Pac. 10 Conference</u>, 101 F.3d 1315, 1318 (9th Cir. 1996)).

As explained below, Plaintiff fails to plead the first and second elements of its section 1 claim.  Because Plaintiff does not sufficiently state a section 1 claim, the Court does not address Defendants' argument that Plaintiff fails to allege antitrust injury or that its antitrust claim is impliedly precluded by federal securities laws.

I.   Unreasonable Restraint of Trade

The Sherman Act does not condemn every restraint of trade; instead, the law "was intended to prohibit only <u>unreasonable</u> restraints of trade." <u>NCAA v. Bd. of Regents of Univ. of Okla.</u>, 468 U.S. 85, 98 (1984) (emphasis added).

To determine whether an alleged restraint is unreasonable, a court may employ a rule of reason analysis or a <u>per se</u> rule of illegality.  Under the rule of reason analysis, which "is the presumptive or default standard," a plaintiff must "'demonstrate that a particular contract or combination is in fact unreasonable

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

and anticompetitive.'"  California ex rel. Harris v. Safeway, ___ F.3d ___, 2011 WL 2684942, at *11 (9th Cir.) (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  Making this showing "entails significant costs" because litigation "of the effect or purpose of a practice often is extensive and complex." Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 343 (1982) (citation omitted).

The per se rule of illegality obviates the need for the resource-intensive inquiry into reasonableness.  "The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . ." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007).  "Resort to per se rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output." Id.  A "per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." Id. at 886-87 (citations omitted).  Courts should be reticent to adopt a per se rule "where the economic impact of certain practices is not immediately obvious." Id. at 887.

As noted above, Plaintiff labels Defendants' challenged conduct as a horizontal bid-rigging arrangement, which is per se illegal under the Sherman Act.  United States v. Green, 592 F.3d 1057, 1068 (9th Cir. 2010).  To support its assertion that Defendants rigged bidding for Del Monte, Plaintiff points to the alleged violation of the No-Teaming Provision of the February 2008

confidentiality agreement.  It is not apparent, however, how the breach of this provision constituted an unreasonable restraint of trade, let alone per se illegal bid rigging.

Plaintiff cites Green, which does not support its position. In that case, Green had near absolute control over the bidding process, in which contractors fashioned their bids "without regard to the competition."  592 F.3d at 1068-69.  Here, Plaintiff's allegations do not imply that Barclays, or any other entity or combination of entities, had the same control over the process as Green.  While Barclays allegedly steered Del Monte to consider only the KKR-led team's bid, there are no allegations that Barclays required KKR and Centerview to join Vestar in order to bid, that Barclays influenced the team's bid or that Barclays prevented other entities from making offers before or during the go-shop periods.  There are no allegations suggesting that the KKR-led team made its bid "without regard to the competition;" the bid was made before the go-shop periods, during which other bids could have been made.  Plaintiff alleges that no bids were made during the go-shop periods because members of a private equity firm cartel "do not compete against each other during" such periods.  1AC ¶ 74.  However, this allegation does not address the potential for bids from entities not part of the cartel, such as CVC, which placed a bid during the first round and was not allegedly a cartel member.  Nor does it address Campbell's Soup, which had expressed interest in acquiring Del Monte in the first round of bidding and was a "strategic buyer," not a private equity firm.  Without any party holding absolute control over the bidding process, it is not apparent that Defendants undertook any conduct

United States District Court
For the Northern District of California

that had "'manifestly anticompetitive' effects and lack[ed] 'any redeeming virtue.'" Safeway, 2011 WL 2684942, at *11 (quoting Leegin, 551 U.S. at 886). Thus, Plaintiff has not alleged a restraint of trade that is per se illegal.

Nor does Plaintiff allege an unreasonable restraint of trade under a "quick look" antitrust analysis. This "truncated rule of reason . . . analysis may be appropriately used where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" Safeway, 2011 WL 2684942, at *11 (quoting Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999)). To support use of a quick-look analysis, Plaintiff repeats only its flawed argument that Defendants engaged in horizontal bid rigging. As explained above, although the No-Teaming Provision may have been violated, it is not apparent that its breach necessarily had an anticompetitive effect.

Finally, because it has not alleged a relevant market, Plaintiff does not satisfy its pleading burden to sustain a section 1 claim under a rule of reason analysis. Tanaka, 252 F.3d at 1063 (stating that, under a rule-of-reason analysis, the failure "to identify a relevant market is a proper ground for dismissing a Sherman Act claim") (citing Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105 (9th Cir. 1999)). Citing Forsyth v. Humana, Inc., 114 F.3d 1467 (9th Cir. 1997), Plaintiff maintains that a relevant market need not be plead because it has alleged direct anticompetitive effects. However, Forsyth was a monopolization case under section 2 of the Sherman Act, which

**United States District Court**
For the Northern District of California

addressed the evidence necessary to show a defendant's market

power.  See id. at 1475-76.

Accordingly, Plaintiff fails to state its section 1 claim

against Defendants.  The claim is dismissed with leave to amend to

plead an unreasonable restraint of trade.

II.  Antitrust Conspiracy

Defendants contend that, even if Plaintiff were to plead an

unreasonable restraint of trade, it fails to allege an antitrust

conspiracy.

As an initial matter, Barclays', Moses' and Goldman Sachs'

participation in the purported conspiracy is not inconsistent with

a theory that Defendants engaged in an alleged horizontal

restraint of trade, even though these Defendants were not KKR,

Centerview and Vestar's competitors.  See Bus. Elecs. Corp. v.

Sharp Elecs. Corp., 485 U.S. 717, 730 (1988) ("Restraints imposed

by agreement between competitors have traditionally been

denominated as horizontal restraints.").  Non-competitors can

agree to participate in a horizontal conspiracy.  See, e.g., In re

Ins. Brokerage Antitrust Litig., 618 F.3d 300, 337 (3d Cir. 2010)

("The fact that Marsh, an entity vertically oriented to the

insurers, appears to be a sine qua non of the alleged horizontal

agreement is not necessarily an obstacle to plaintiffs' claim.");

United States v. MMR Corp. (LA), 907 F.2d 489, 498 (5th Cir. 1990)

("[A] noncompetitor can join a Sherman Act bid-rigging conspiracy

among competitors.").  Indeed, in Green, the defendant was a

consultant who did not compete with the contractors in the case;

nevertheless, the Ninth Circuit found sufficient evidence to

sustain her conviction for participating in a horizontal bid

rigging scheme.  Thus, that Barclays, Moses and Goldman Sachs were not KKR, Centerview and Vestar's competitors does not require dismissal of Plaintiff's conspiracy claim.

Nevertheless, Plaintiff does not allege facts that imply that all the parties agreed to the purported antitrust conspiracy.  To state a claim under section 1, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made."  Twombly, 550 U.S. at 556.  "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory."  Id. at 557.

Here, Plaintiff pleads reasons as to why each of the parties was interested in having the KKR-led team prevail in bidding for Del Monte.  Barclays and Moses wanted to benefit from both sides of the deal.  KKR, Centerview and Vestar wanted to prevail at the lowest possible price.  Goldman Sachs wanted to obtain five-percent of the financing syndication rights, as promised by KKR.  Plaintiff also alleges roles for Defendants in a conspiracy.  This, on its own, is not sufficient; "plaintiffs must allege additional facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior."  Twombly, 550 U.S. at 552 (citation and internal quotation and editing marks omitted).

Additionally, Plaintiff's allegations do not suggest that Goldman Sachs was aware of what had occurred in the bidding process prior to it receiving the offer of a percentage of the

United States District Court
For the Northern District of California

syndication rights from KKR.  Plaintiff pleads only that Goldman
Sachs dropped its efforts to run the go-shop period after KKR
offered it five percent of the syndication rights.  This does not
imply that Goldman Sachs had any knowledge of any arrangement
between Barclays, Moses, KKR, Centerview and Vestar.

Plaintiff's reliance on the alleged "club rules" complicates
its antitrust theory.  Plaintiff does not allege that Barclays,
Moses, or Vestar were aware of the alleged private equity firm
cartel or that its rules could preclude bids by some firms during
a go-shop period.  Without such an allegation, there can be no
meeting of the minds that Defendants' alleged antitrust conspiracy
would depend on the operation of the "club rules."

Accordingly, Plaintiff's claim is dismissed for the
additional reason that Plaintiff does not allege an antitrust
conspiracy.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' joint
motion to dismiss (Docket No. 67) and Goldman Sachs' motion to
dismiss (Docket No. 66).  Plaintiff fails to plead an unreasonable
restraint of trade and a cognizable an antitrust conspiracy.

Plaintiff may file an amended complaint by September 15,
2011.  Defendants shall answer or move to dismiss any amended
complaint within twenty-one days of the date it is filed.  If
Defendants move to dismiss Plaintiff's amended pleading, they
shall submit a consolidated brief, not to exceed thirty-five
pages.  If some Defendants desire to file separate memoranda of
points and authorities, they may do so, so long as Defendants'
briefing collectively does not exceed the thirty-five-page limit.

**United States District Court**
For the Northern District of California

Plaintiff shall respond in a brief not to exceed thirty-five pages.  Defendants' reply, if necessary, shall not exceed twenty pages.  Any motion to dismiss will be heard on November 17, 2011 at 2:00 p.m.

Unless the parties stipulate to the contrary, Plaintiff's motion for class certification is due November 17, 2011, Defendants' opposition is due January 12, 2012, and Plaintiff's reply is due January 26, 2012.  The motion will be heard on February 16, 2012 at 2:00 p.m.

IT IS SO ORDERED.

Dated: 8/30/2011

CLAUDIA WILKEN
United States District Judge